## CHAUVENET v. MERCHANTS NAT. BANK et al.

### Civ. No. 104.

District Court, Maine, S. D.

March 30, 1942.

Robinson & Richardson and Barbara Files, all of Portland, Me., for plaintiff.

Cook, Hutchinson, Pierce & Connell, of Portland, Me., and Louis C. Stearns, of Bangor, Me., for defendants.

PETERS, District Judge.

In this case, heard by the Court without a jury, the plaintiff, beneficiary under the will of his mother, Annie L. A. Chauvenet, late of Boston, seeks to enjoin the defendants, trustees under her will, against making an alleged improvident sale of some of the trust property consisting of real estate in Maine.

The plaintiff alleges that the defendants, as trustees, propose to sell the property referred to (asserted to be worth at least $20,000) for the sum of $11,000, without having made an effort to find a purchaser for a higher price. He alleges that with reasonable effort the appraised value of $17,350 at least could be obtained, and states that both the proposed purchaser and the plaintiff himself have offered the trustees more than $11,000 for the property without changing their determination to sell for that price to this customer.

The plaintiff charges that the carrying out of the proposed sale by the trustees would be a breach of their trust that would irreparably damage the estate in which the plaintiff is interested.

The defendants deny the plaintiff's assertions, except that it is proposed to make the sale for $11,000.

From the evidence I find the following facts:

Mrs. Chauvenet, the testatrix, died in 1939.

Her summer residence on the island of Vinalhaven in Penobscot Bay, as a part of her residuary estate, was left in trust to the defendants for the benefit of her son, the plaintiff, and his children. This property, according to the inventory and appraisal made under authority of the Probate Court, consisted of 75 acres of "wood and back land", valued at $600, and 25 acres of "shore front land", valued at $2,500. The buildings on the land fronting Fox Island Thoroughfare consisted of a large summer cottage with out-buildings, a caretaker's house and two boathouses, with appurtenances, all the buildings being valued at $14,250. The personal property on the place, consisting of furniture and

boats, valued at $2,197 was left to the plaintiff outright.

The appraisers evidently considered the principal value to be in the large dwelling house which they appraised at $10,000. It is a wooden house built in 1909, having seven or eight bedrooms, three bathrooms, large living room with fireplace and other rooms in the main part of the house, with more rooms in the kitchen part. This, however, was not income-paying property; quite the contrary, as the cost of carrying it was $1,600 per year for a caretaker and taxes, with insurance, repairs and depreciation in addition. Efforts were made by the trustees to procure a tenant for the summer seasons of 1940 and 1941, without success. The trustees had an unrestricted power to sell and it was obviously their duty to sell such property as soon as reasonably possible. It was a part of the principal of a trust fund which they were required to so invest as to produce a "safe and steady income".

The trustees made diligent efforts to effect a sale. One of the trustees, Mr. Allen, a nephew of Mrs. Chauvenet, practicing law in Boston, had handled her affairs for some time before her death and was active in trying to sell when he became a trustee. The property was advertised in newspapers and otherwise, and placed for sale in the hands of experienced real estate agents, including one in the vicinity of the property who was active in his efforts to find a purchaser,—without success until the purchaser hereinafter mentioned, and whose purchase is complained of, was found.

I find in the evidence no support for the allegation in the complaint that there was a lack of proper effort by the trustees to sell the property. To persons familiar with recent conditions on the Maine coast, especially as affecting summer dwelling houses of the rather more expensive type, built about thirty years ago, it is not surprising that the trustees met with difficulty in finding a purchaser for such property.

The claim by the plaintiff that the property was worth $20,000, or anywhere near that sum, is also unsupported by the evidence. On the contrary, the evidence satisfies me that $11,000 was a fair price. In fact, I think the trustees were fortunate to be able to get such a price for property which not only shares, with other summer property, the handicaps of depression times, but to sell which necessitates finding a unique purchaser,—one who is financially able to keep up a rather expensive establishment and whose family is willing to live on an island having none of the facilities offered by a village and no steamboat connection with the mainland.

The other allegations in the complaint, to the effect that the trustees propose to sell the property for a price less than they have been offered or could get, are based on the following facts which appear in the evidence:

The local real estate agent employed by the trustees succeeded in interesting Mrs. Eleanor B. Saltonstall of Brookline, Massachusetts, in the property. Mrs. Saltonstall had owned and occupied for many years a place at Vinalhaven adjoining the Chauvenet property and the two families were friendly. After some negotiations Mrs. Saltonstall made an offer of $12,000 for the real estate, title to which was in the trustees, and the furniture and boats, title to which was in Mr. Chauvenet. The offer was communicated to Mr. Chauvenet who was at his home in Virginia. In Mr. Allen's letter to him of October 3, 1941, it was stated that the offer of $12,000 was for the real estate and whatever personal property was there. Mr. Chauvenet replied by wire on October 9th as follows: "Agreeable to sale at twelve thousand net to the estate. Mrs. Saltonstall obviously wants it at such a bargain feel sure she will not let permission stand in her way. Have arrangements made to keep furniture there until I can move it which I will do as soon as possible."

This telegram is somewhat ambiguous, but counsel agree that the price mentioned referred to the real estate only.

On October 21, 1941, the offer of Mrs. Saltonstall, made through her son and agent, was put in writing and was made $11,000 for the real estate and $1,000 for the personal property.

On October 29 Mr. Chauvenet came to Boston and induced Mrs. Saltonstall to increase her offer for the boats and furniture to $1,500 with some deductions of furniture. It was understood by all parties that the offer to the trustees of $11,000 for the real estate held good whether or not Mr. Chauvenet accepted the offer of $1,500 for the personal property. Afterward, on the same day, Mr. Chauvenet interviewed

Mr. Allen, told him of the increased offer for the personal property and, after some conversation about the real estate, finally gave his consent to its sale by the trustees to Mrs. Saltonstall for $11,000. This is now admitted by plaintiff's counsel in argument, as it should be in view of the evidence. In the same conversation Mr. Chauvenet indicated his willingness to accept the offer of $1,500 for the personal property, and it was arranged that a bill of sale of it should be drawn up, reserving certain furniture which Mr. Chauvenet was to select.

On October 30 the offer for the real estate, with the consent of the trustees, was divided, and made $8,000 for part of it and $3,000 for the balance, as shown by letter of that date from Mr. Saltonstall to the trustees. And on the same day the trust committee of the bank voted to join Mr. Allen as cotrustee in accepting the offer.

On the following day, October 31, Mr. Allen, for the trustees, wrote Mr. Saltonstall accepting the offer of $11,000 for the real estate.

A few days later, after consultations between Mr. Allen and Mr. Chauvenet's attorney concerning drawing the papers, a formal contract of purchase and sale was drawn up and signed by the trustees and Mrs. Saltonstall.

The plaintiff seems to claim that in a conversation between Mr. Allen and him on October 30 he withdrew his consent to the sale of the real estate, and that Mr. Allen agreed to do nothing further about the matter until Mr. Chauvenet should return from a trip to Vinalhaven which he was about to make in connection with his personal property; but there is no satisfactory evidence to that effect even in the testimony of Mr. Chauvenet. It does not appear that Mr. Chauvenet was successful in making either the trustees or his own attorney understand that he had withdrawn his consent to the sale (which consent of course was not necessary) and there is no satisfactory evidence that Mr. Allen, as one of the trustees, made any agreement to delay closing the sale which was closed by his letter of the 31st.

On November 3, after Mr. Chauvenet's arrival at Vinalhaven, he telegraphed the Merchants National Bank as follows: "I am buying North Haven real estate at eleven thousand less commission. Please prepare for signature for Thursday. If necessary to name third party use John K. Berry, Jr."

The North Haven mentioned was the post office for Vinalhaven where the property referred to is situated.

Prior to that telegram Mr. Chauvenet, who had taken part for some time in the efforts of the trustees to sell the property, had not informed either of the trustees that he had any intention of buying the real estate.

On receipt of the telegram, the trustees wired Mr. Chauvenet: "Trustees on October 31 with your knowledge and approval accepted offer of eleven thousand for real estate. Therefore cannot sell to you."

Mr. Chauvenet then returned to Boston and with admirable persistence interviewed the Saltonstalls again and persuaded them to make an offer for the real estate with the boats included but without any furniture, and on November 10th Mr. Saltonstall wrote the trustees offering, in behalf of his mother, $13,000 for the real estate and boats, dividing it $12,600 for the real estate and $400 for the boats. The offer for the real estate was on the express condition that Mr. Chauvenet should put in the boats for $400.

This offer, referred to as the "good will offer", was induced to some extent by the desire of Mrs. Saltonstall to continue the previous friendly relations between the two families. The letter concluded with the following: "If this compromise offer is not accepted promptly my mother will insist on the offer and acceptance as set forth in our letters of October 30 and 31. This letter is not to be taken as a withdrawal of the offer of October 30 and 31, but simply an offer in compromise of the whole situation."

However, the effort of Mrs. Saltonstall to include both good will and the boats in the purchase was unsuccessful. The letter was considered at a meeting of the interested parties at the Merchants National Bank on November 12th. There were present, among others, Mr. Saltonstall Mr. Allen, Mr. Chauvenet and a trust officer of the bank. Mr. Chauvenet stated that the Saltonstall proposition was not acceptable to him. Mr. Saltonstall then stated that he had no other alternative but to hold the trustees to the original agreement.

Subsequently on the same day Mr. Chauvenet wrote a letter to the trustees as follows:

"In connection with the proposed sale of the real estate at North Haven, Maine, belonging to the estate of my mother, I wish to repeat my conversation with you today in the following respects:

"1. I am informed that the letters of October 30th and 31st between the Trustees and Mr. Saltonstall did not result in a binding contract between the parties;

"2. The offer of Mr. Saltonstall is inadequate for the property;

"3. That wholly apart from this I was, and am still, willing to pay for this property a price larger than has as yet been offered by Mr. Saltonstall;

"4. If you act contrary to my interests as a beneficiary, then I shall expect to hold you personally responsible for the consequences."

This action was commenced November 18, 1941.

From the foregoing it is clear that the only offer for the real estate higher than $11,000 made by the Saltonstalls was one conditioned upon the approval of its terms by Mr. Chauvenet who prevented its acceptance by withholding his consent.

No offer to pay more than $11,000 was made by Mr. Chauvenet himself, other than was contained in his letter of November 12 which mentions no sum that he was willing to pay.

Counsel for the defendants in argument call attention to the fact that the offer of Mr. Chauvenet of November 3 to pay for the real estate "$11,000 less commission", which would be $10,450, was less advantageous to the estate than the Saltonstall offer of $11,000, because if the trustees had sold to Mr. Chauvenet for $10,450 they would still be under obligation to pay $550 commission to the broker who produced Mrs. Saltonstall as a purchaser.

The statement of Mr. Chauvenet on November 12 that he was then "still" willing to pay more than had been offered by Mrs. Saltonstall for the real estate has not been followed up by naming any definite sum that he woud pay or offering any agreement to make the estate whole in case it should be obliged to pay damages for the proposed breach of the contract to sell to Mrs. Saltonstall.

The necessary conclusions from the foregoing are quite obvious.

The trustees, by their acceptance of the offer of $11,000, evidenced by the letters of October 21, 30 and 31, bound themselves to sell for that sum to Mrs. Saltonstall. Since then they have received no offer of a larger sum which they could convert into a contract by accepting.

■ If the trustees should act as the plaintiff desires, repudiate the Saltonstall contract and start negotiations with him for a sale at a higher price, the estate would not necessarily benefit from the result, even if a higher price should be obtained. The Saltonstall interests have stated, both before the trial and in court, that they would insist upon the letter of their contract. They could and, presumably, would claim damages for a breach of that contract. Where such a contract by trustees is broken with a resulting benefit to the estate in a larger price, any damages recovered for its breach may be charged by the trustees to the estate to the extent that the price received exceeds the contract price.

"* * * if the trustee in the proper exercise of a power of sale makes a contract to sell trust property, and subsequently he receives a better offer for the property from another person to whom he sells it, and the trustee is compelled to pay damages for breach of contract to the first purchaser, he is entitled to indemnity out of the proceeds of the sale to the extent to which they exceeded the price which he would have received from the original purchaser" (citing Yerkes v. Richards, 1895, 170 Pa. 346, 32 A. 1089.) Scott on Trusts, Vol. 2, Sec. 246, at p. 1422.

It is also apparent, of course, that if negotiations with Mr. Chauvenet, after the repudiation of the Saltonstall contract, should result in a sale to him, the "larger price", which he said on November 12 he was willing to pay, would have to exceed the Saltonstall price by more than $550,—of which there is no assurance,—before the estate would receive any benefit from the transaction.

The suggestion of the plaintiff that negotiations could profitably be opened by the trustees with the Saltonstalls for a higher price is evidently futile in view of the situation. The possibility of a higher price from the Saltonstalls was foreclosed by the plaintiff himself.

The matter involved here is the propriety of the action of the trustees, under the circumstances disclosed, as affecting the estate held in trust in which others are interested besides the plaintiff.

The trustees, as I view it, have acted with fidelity and good business judgment in the execution of their trust, so far as the action complained of is concerned, which is the only matter before this Court, and there is no showing which would warrant the drastic action against them prayed for in the complaint.

The complaint will be dismissed with costs.